1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

8

9  DORAL BANK PUERTO RICO, on Behalf of
Itself and All Others Similarly Situated,

10                          Plaintiff,          NO. _____

11          v.                                  COMPLAINT – CLASS ACTION

12  WASHINGTON MUTUAL ASSET                     COMPLAINT FOR VIOLATIONS
ACCEPTANCE CORPORATION; DAVID BECK;            OF SECTIONS 11, 12 AND 15 OF
13  DIANE NOVAK; THOMAS LEHMANN;                THE SECURITIES ACT OF 1933
STEPHEN FORTUNATO; DONALD WILHELM                          AND
14  WAMU CAPITAL CORPORATION; FIRST            FOR VIOLATIONS OF
AMERICAN CORPORATION and FIRST                 WASHINGTON STATE LAW
15  AMERICAN EAPPRAISEIT, LLC,
                                                **JURY TRIAL DEMANDED**
16                          Defendants.

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW
Case No.

Plaintiff alleges the following based upon the investigation of counsel, Cohen Milstein Sellers & Toll, PLLC ("CMST"), which included a review of United States Securities and Exchange Commission ("SEC") filings by Washington Mutual, Inc. (WMI), Washington Mutual Bank ("WMB"), Washington Mutual Mortgage Securities Corporation ("WMMSC"), Defendant Washington Mutual Asset Acceptance Corporation ("WMAAC"), Defendant Washington Mutual Capital Corporation ("WCC"), First American Corporation ("First American") and First American eAppraisIT, LLC ("eAppraiseIT"), as well as certain non-defendant WaMu Mortgage Pass-Through Trusts (*see* ¶9, *infra*), regulatory filings and reports and advisories about those entities, press releases and other public statements issued by or on their behalf, the complaint filed by the Attorney General of the State of New York against the First American Corporation, the Complaint filed by shareholders of First American Corporation against officers of that Corporation, information readily obtainable on the Internet and their own internal investigation. Plaintiff's counsel believes that substantial additional evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery. The claims asserted herein under the Securities Act of 1933 (the "Securities Act" or "1933 Act") do not sound in or arise from allegations of fraud.[1]

## I.    NATURE OF THE ACTION

1.    This is a class action brought by the Doral Bank Puerto Rico ("Doral" or "Plaintiff") alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, as well as causes of action arising under and pursuant the Washington State Securities Act ("WSSA"), RCW 21.20.010 and 21.20.430(1) and (3), and Washington State Law, on behalf of purchasers of Washington Mutual Mortgage Pass-Through Certificates Series WAMU 2007-OA4, WAMU 2007-OA5, WAMU 2007-OA6, WMALT 2007-OA4, WMALT 2007-OA5, WMALT 2007-OC1, WMALT 2007-OC2, WMALT 2007-3, WMALT 2006-4 and

---

[1]    For the purposes of the within action, all Washington Mutual entities shall be referred to herein collectively as "WaMu."

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 1
Case No.

WMALT 2006-5 (the "Certificates" or the "WaMu Certificates") who purchased the Certificates in public offerings (the "Offerings," *see* ¶9, *infra*), backed by pools first lien single-family residential mortgage loans whose interest rates (after an initial fixed-rate period) adjust monthly and which include a negative amortization feature.

2.     The Certificates were issued pursuant to a Form S-3 Registration Statement filed with the SEC by Defendant WMAAC on or about March 13, 2007, Registration No. 333-141255, and an amendment to the Form S-3/A on April 9, 2007 (the "Registration Statement").

3.     The Offerings occurred in large part in this District. The Certificates herein are Mortgage Pass-Through Certificates collateralized by residential home loans originated by WMB or its affiliate WMMSC, which, at all relevant times, were commercial and residential lenders. The mortgages and liens on the mortgaged properties constituting the Certificates' collateral were, as set forth in the Registration Statement, to be the principal source by which Certificate purchasers were to obtain repayment of their investment plus interest. As also set forth in the Registration Statement, the Certificate collateral was purportedly originated by WMB and WMMSC pursuant to specific underwriting procedures and guidelines (the "Guidelines"). The Underwriter of the Offerings was Defendant WaMu Capital Corporation ("WCC", the "Underwriter" or the "Underwriter Defendant"). The Underwriter was obligated to conduct meaningful due diligence to ensure that the Registration Statement and later-filed Prospectus Supplements (collectively, the "Offering Documents") contained no material misstatements or omissions, including the stated manner in which the mortgages had been originated. The Underwriter received substantial fees for its work in connection with the Offerings. At the time of the Offering, the Certificates were issued at approximately par or $1.00 face value per Certificate.

4.     Following the issuance of the Certificates, disclosures began to emerge revealing the routine disregard for the Guidelines in mortgage loan origination of the collateral underlying the Certificates. These disclosures were confirmed by substantially higher rates of delinquencies

and foreclosures on collateral for such highly-rated debt issues. Plaintiff purchased certain WaMu Certificates pursuant to the Registration Statement. However, as of the date the within action was commenced, Plaintiff's investment suffered a significant loss. The claims asserted herein under the Securities Act do not sound in or arise from allegations of fraud.

## II.    JURISDICTION AND VENUE

5.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

6.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

7.    Venue is proper in this District pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements and omissions contained in the Registration Statement and Prospectuses filed in connection with the Offerings, occurred in substantial part in this District. Additionally, the Certificates were actively marketed and sold in this District. In addition, Defendants' principal places of business are this District.

8.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

9.    Plaintiff Doral is a financial services bank principally located in Puerto Rico. Doral's offices are located at 1451 Franklin D. Roosevelt Avenue, San Juan, Puerto Rico, 00920-2717. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, and the Class purchased WaMu Certificates pursuant to the Registration Statement and Prospectus Supplements which contained material misstatements and omissions of facts necessary to make the facts stated therein not misleading. Plaintiff and the Class relied on the

misstatements and omissions in the Prospectuses and have suffered damages pursuant to Sections 11, 12 and 15 of the Securities Act. Furthermore, as set forth in the attached Certification, Plaintiff purchased WaMu Mortgage-Backed Certificates, issued by common law Trusts created by WaMu for the sole purpose of issuing said Certificates, during the Class Period at artificially inflated prices and was damaged thereby. The Trusts which are the subject of the allegations herein include:

a.     WaMu Mortgage Pass-Through Certificates Series 2007-OA4 Trust was the issuing entity for the 2007-OA4 Offering which occurred on April 24, 2007.

b.     WaMu Mortgage Pass-Through Certificates Series 2007-OA5 Trust was the issuing entity for the 2007-OA5 Offering which occurred on May 22, 2007.

c.     WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust was the issuing entity for the 2007-OA6 Offering which occurred on June 22, 2007.

d.     WMALT Series 2007-OA4 Trust was the issuing entity for the WMALT 2007-OA4 Offering which occurred on May 23, 2007.

e.     WMALT Series 2007-OA5 Trust was the issuing entity for the WMALT 2007-OA5 Offering which occurred on June 25, 2007.

f.     WMALT Series 2007-OC1 Trust was the issuing entity for the WMALT 2007-OC1 Offering which occurred on May 10, 2007.

g.     WMALT Series 2007-OC2 Trust was the issuing entity for the WMALT 2007-OC2 Offering which occurred on June 25, 2007.

h.     WMALT Series 2007-3 Trust was the issuing entity for the WMALT 2007-3 Offering which occurred on April 24, 2007.

i.     WMALT Series 2007-4 Trust was the issuing entity for the WMALT 2007-4 Offering which occurred on May 23, 2007.

j.     WMALT Series 2007-5 Trust was the issuing entity for the WMALT 2007-5 Offering which occurred on June 26, 2007.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 4
Case No.

10. The Certificates purchased by Plaintiff pursuant to the Registration Statement were WAMU Series 2007-OA4, WAMU Series 2007-OA5 and WMALT Series 2007-OA5. Plaintiff also purchased the following WAMU Certificates pursuant to a Form S-3 Registration Statement filed by WMAAC with the SEC on December 30, 2005, and amended thereafter by a Form S-3/A amendment on January 3, 2006 (the "2006 Registration Statement"), which is not at issue herein:

a.      WaMu Mortgage Pass-Through Series 2006-AR17 Certificates, pursuant to a public offering which occurred on or about November 17, 2006.

b.      WaMu Mortgage Pass-Through Series 2006-AR18 Certificates, pursuant to a public offering which occurred on or about December 18, 2006.

c.      WaMu Mortgage Pass-Through Series 2007-OA1 Certificates, pursuant to a public offering which occurred on or about January 24, 2007.

11. Because of the pendency of a consolidated related class action case now pending before this Court involving various offerings of WaMu Certificates issued pursuant to the 2006 Registration Statement, wherein a lead plaintiff has already been appointed by this Court, the within Complaint does not assert claims relating to those offerings at this time.

12. WMB is identified as the "sponsor" and/or "servicer" of the Certificates. The Prospectus represents that it selects the mortgage loans held for sale pursuant to the Certificates. The servicer was authorized to use its discretion as to its servicing of the loans specified in the pooling agreement, and as to which mortgages to include in the pool.

13. WMMSC, is identified as the "sponsor" and/or "servicer" for certain Certificates. The Prospectus represents that the sponsor purchases the mortgage loans to be securitized from either WMB or third-party originators named in the prospectus supplements. WMMSC was, at all relevant times, a wholly-owned subsidiary of WMB.

14. Defendant WMAAC is the Depositor for the Offerings. WMAAC is a wholly owned operating subsidiary of WMB. According to its SEC filings, WMAAC, at all relevant

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 5
Case No.

times, maintained its principal offices located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101. WMAAC is also an affiliate of WMMSC, one of the Sponsors and Master Servicers of the various Certificates, as well as one of the Originators of the underlying mortgage loan collateral.  WMAAC was responsible for filing the Registration Statement with the SEC pursuant to which the Certificates were offered to the public.

15.    Defendant David Beck ("Beck") was, during the relevant period, a Director, the President and Principal Executive Officer of WMAAC.  Beck signed the March 13, 2007 Registration Statement Form S-3 and the April 9, 2007, Registration Statement Form S-3/A pursuant to which the Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

16.    Defendant Diane Novak ("Novak") was, during the relevant period, a Director of WMAAC.  Novak signed March 13, 2007 Registration Statement Form S-3 and the April 9, 2007, Registration Statement Form S-3/A pursuant to which the Certificates were offered, either on behalf of herself or by the authorized Attorney-In-Fact.

17.    Defendant Thomas Lehmann ("Lehmann") was, during the relevant period, the Director and President (Principal Executive Officer) of WMAAC.  Lehmann signed the, March 13, 2007 Registration Statement Form S-3 and the April 9, 2007, Registration Statement Form S-3/A pursuant to which the Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

18.    Defendant Stephen Fortunato ("Fortunato") was, during the relevant period, the Chief Financial Officer (Principal Financial Officer) of WMAAC.  Fortunato signed the, March 13, 2007 Registration Statement Form S-3 and the April 9, 2007, Registration Statement Form S-3/A pursuant to which the Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

19.    Defendant Donald Wilhelm ("Wilhelm") was, at all times during the relevant period, the Controller (Principal Accounting Officer) of WMAAC.  Wilhelm signed the, March

13, 2007 Registration Statement Form S-3 and the April 9, 2007, Registration Statement Form S-3/A pursuant to which the Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

20.    Defendants Beck, Novak, Lehmann, Fortunato and Wilhelm are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with WMAAC, possessed the power and authority to control the contents of WMAAC's submissions to the SEC and the market, and participated in the drafting and editing of the Registration Statement and Prospectuses. The Individual Defendants all conducted business and had business residences at all relevant times at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.

21.    The Individual Defendants were officers and/or directors of WMAAC at the times the Registration Statement and Prospectuses for the Offerings became effective, and with their consent, were identified as such in the Registration Statement. In addition, they each signed the relevant Registration Statement or authorized them to be signed on their behalf.

22.    The Individual Defendants, as officers and/or directors, each had a duty to promptly disseminate accurate and truthful information with respect to WMACC and the WaMu Trusts, and to correct any previously issued statements issued by, or on behalf of WMAAC and/or the WaMu Trusts that had become materially misleading. The Individual Defendants' misrepresentations and omissions in the Prospectuses violated these specific requirements and obligations. The Individual Defendants were signatories to the Registration Statement filed with the SEC and incorporated by reference in the Prospectus Supplements.

23.    Defendant WCC is an investment banking firm which, at all relevant times, was principally located at 1301 Second Avenue, Seattle, Washington, 98101. WCC served as the Underwriter for each of the WaMu Certificates Offerings. WCC was intimately involved in the aforementioned Offerings and failed to perform the requisite level of due diligence in connection with these Offerings. The Prospectuses disseminated in connection with the Offerings contained

material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying subprime mortgage loans. WCC is one of the leading underwriters in mortgage- and asset-backed securities in the United States.

24. Defendants WMAAC, the Individual Defendants and WCC are referred to herein as the "Securities Act Defendants." The Securities Act Defendants are all liable, jointly and severally, as participants in the issuance of the WaMu Certificates, including issuing, causing, or making materially misleading statements in the Prospectuses and omitting material facts necessary to make the statements contained therein not misleading.

25. WMI is a Washington corporation, with its principal place of business located, at all relevant times, at 1301 Second Avenue, Seattle, Washington, 98101. Defendant WMAAC was at all relevant times a wholly-owned subsidiary of WMB, which was an affiliate of WMI.

26. Defendants WMAAC, the Individual Defendants and WCC are collectively referred to as the "Defendants."

## IV.    CLASS ACTION ALLEGATIONS

27. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or acquired the Certificates (the "Class") pursuant and traceable to the Registration Statement and Prospectuses issued in connection with the Offerings from the effective date through the date of the filing of this action (the "Class Period"). Excluded from the Class are all Defendants, their respective officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members in the proposed Class. Record owners and other members of the Class

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 8
Case No.

1   may be identified from records maintained by Defendants and/or the Trustee for the Trusts and

2   may be notified of the pendency of this action by mail, the internet or publication using the form

3   of notice similar to that customarily used in securities class actions.

4         29.    Plaintiff's claims are typical of the claims of the members of the Class as all

5   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

6   statutory law complained of herein.

7         30.    Plaintiff will fairly and adequately protect the interests of the members of the

8   Class and has retained Cohen Milstein Sellers and Toll, PLLC and Tousley Brain Stephens

9   PLLC, counsel competent and experienced in class and securities litigation.

10        31.    Common questions of law and fact exist as to all members of the Class and

11  predominate over any questions solely affecting individual members of the Class.  Among the

12  questions of law and fact common to the Class are:

13        a.    whether the provisions of the Securities Act were violated by the

14  Defendants as alleged herein;

15        b.    whether the Registration Statement and Prospectuses contained material

16  misstatements or omitted statements of material fact; and

17        c.    to what extent the members of the Class have sustained damages pursuant

18  to the respective statutory measures of damages.

19        32.    A class action is superior to all other available methods for the fair and efficient

20  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

21  the damages suffered by individual Class members may be relatively small, the expense and

22  burden of individual litigation make it impossible for members of the Class to individually

23  redress the wrongs done to them.  There will be no difficulty in the management of this action as

24  a class action.

25

26

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 9
Case No.

## V.    SUBSTANTIVE ALLEGATIONS FOR SECURITIES ACT CLAIMS

33.    Currently, the United States is ensnared in a financial crisis arising, in material part, from the opportunity which drove financial firms to issue billions of dollars of debt securities "collateralized" or securitized with mortgages which only recently have been revealed to have been recklessly underwritten and originated.  The Plaintiff and Class as purchasers of the Certificates have been the victims of just such wrongful practices, having purchased the Certificates pursuant to Offering Documents which contained misstatements and omissions concerning the mortgage collateral "securitizing" the Certificates.  The Trusts and other entities related to the Offerings, *i.e.*, the Depositor and Underwriter Defendant, had enormous financial incentive to consummate the Offerings of the Certificates as quickly as possible since they were paid upon completion a percentage of the total dollar amount of the Offerings sold to investors.  Since the risk of the underlying collateral failing was not assumed by either WMAAC, the WaMu Trusts, the Trustee or the Underwriter, there was also enormous incentive not to conduct full, complete and meaningful due diligence of the statements in the Registration Statement including those relating to the underlying mortgage collateral.

34.    The structure of each Offering was generally the same.  WMAAC filed a Registration Statement in connection with the issuance of various series and classes of debt securities.  At some time at or subsequent to each Offering, the "Issuing Entity" Trust was then formed under the laws of the State of Delaware, *i.e.,* WaMu Mortgage Pass-Through Certificates Series 2007-OA4 Trust, for which a Prospectus Supplement was filed on behalf of as entity responsible for issuing the Certificates therein.

35.    Typically, the loans are originated by the Sponsor(s), or WMB and/or WMMSC, who then disposes of its loans primarily by selling them to third parties and through securitizations.  The Sponsor works with the Underwriter and the Nationally Recognized Statistical Ratings Organizations (the "Ratings Agencies") to select the pool of mortgage loans and structure the securitization transaction.  The Sponsor or subsidiary thereof also services the

mortgage loans. On the closing date of any given Offering, the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the Depositor, who will in turn convey the initial mortgage loans and the related mortgage insurance policies to the Trust, by way of the Trustee. The Certificates are backed by the Issuer, and consist of, *inter alia*, the mortgage loans; collections in respect of principal and interest of the mortgage loans received; and the amounts on deposit in the collection account, including the payment account in which amounts are deposited prior to payment to the certificate holders. On the payment date, the certificate holders receive payments from the Trustee based on the particular tranche purchased; typically, available funds for each distribution date will equal the amount received by the trustee and available in the payment account on that distribution date, including interest which differs depending upon the tranche held.

36.    In connection with the Offerings, WMAAC, the Individual Defendants and WCC prepared and disseminated Registration Statement and Prospectuses that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

## A.    **WMB's Deficient Lending Practices**

### 1.    **WaMu and Its Core Home Lending Business**

37.    WaMu's residential lending business was a driving force of WaMu's overall operations during the Relevant Period. It is beyond dispute that WaMu's lending operations were a significant contributor to the Company's income and also generated a substantial portion of the Company's assets. For example, in both its 2006 Form 10-K, filed with the SEC on March 1, 2007, and its 2007 Form 10-K with SEC, filed on February 29, 2008, the Company stated that almost 70% of its net interest income was generated by residential real estate loans and related products. Similarly, in its Forms 10-K for 2006 and 2007, WaMu also stated that over 60% of the Company's overall average assets were generated by residential real estate loans and related products.

38.    Throughout the Period, WaMu originated – that is, "sold" to its borrowers – residential loans through its retail and wholesale lending operations, which were primarily issued through WaMu's Home Loans and Commercial Groups – mainly WMAAC.

39.    As a requirement to a WaMu home loan becoming effective, or "closing," WaMu had to underwrite and approve the loan.  That is, WaMu must ensure that the borrower qualifies for the loan product in question under the Company's underwriting standards, based upon documentation of the borrower's credit history and score, income, debt level, and other factors.

40.    A critical requirement in residential loan underwriting is the home appraisal, which is supposed to be an independent assessment of the market value of the real estate pledged by the borrower as collateral against the WaMu loan.

41.    After originating home loans, WaMu either (a) retained the loans as investments in its "held for investment" portfolio, which generally were reflected as assets in the Company's public financial reports and in other information disseminated to the public; or (b) held such loans for sale, and, accordingly, securitized or otherwise sold off such loans to third parties in due course, primarily through the Capital Markets Division of WaMu's Home Loans Group, WCC.

42.    As noted above, WaMu reported significant income from its home lending operations during the Class Period.  With regard to its loans "held for investment," however, WaMu was also required to maintain and publicly report a reserve amount for probable losses related to such loans (for example, losses from WaMu borrowers defaulting on their obligations to make mortgage payments).  WaMu referred to its loss reserve as its Allowance for Loan and Lease Losses (the "Allowance").  The larger this reserve amount the less profit WaMu was deriving from their sub-prime investments, and thus, WMB, WMAAC and the individual Defendants as executives of WMAAC understated the Allowance figure to increase the apparent success of the sub-prime mortgage portfolio.

### 2. WaMu Abandons Customary Lending and Business Practices in Favor of Much Riskier Loan Products and Company Policies

43.     Within the last five years, WaMu began to promote, through its lending subsidiaries WMB, WMMSC and WMAAC, riskier loan products to both prime borrowers (borrowers who appeared to be substantially creditworthy) and subprime borrowers, while reducing the share of traditional, fixed rate loans it originated. Specifically, the Company focused heavily on originating loan products, such as WaMu's "flagship" product, the Option ARM loan, and subprime loans that were "nonconforming"; that is, they did not meet the specifications required by the government-sponsored entities ("GSEs"), such as Freddie Mac or Fannie Mae.

44.     Traditionally, the GSEs provided liquidity to the home mortgage market by purchasing conforming loans and, in certain cases, securitizing the loans. Conforming loans impose certain standards, such as specific debt-to-income ratio limits and documentation requirements. Nonconforming loans, on the other hand, may be for much larger dollar amounts than conforming loans and made to less credit-worthy buyers. Because these nonconforming loans were riskier, WaMu could charge much higher interest rates and fees for their origination.

45.     While WaMu acknowledged publicly that it had altered its loan origination mix in favor of generating more loans with higher profit margins, WMB, WMAAC and the other Defendants did not come close to revealing the full extent of WaMu's actual plans and business practices. As explained below, the Company's concerted efforts to transform itself from a sleepy savings and loan into a high-margin bank began to include highly questionable and unlawful practices. These practices were implemented to artificially fuel the growth that WaMu craved for their own personal short-term gain, all at the expense of WaMu investors.

### 3. WaMu's Risky, Non-traditional Loan Products

46.     In order to maximize the Company's loan volume and the appearance of growth and profitability, WaMu strayed from traditional, high-quality, and fixed-rate lending to promote

instead numerous types of nontraditional loans. Principal among WaMu's exotic loans were its Option ARM loans, a form of adjustable rate mortgage (ARM) loans (a loan where, instead of a fixed rate of interest, the interest rate is periodically adjusted over the term of the loan based on indices such as Treasury securities or the London Interbank Offered Rate ("LIBOR")). As explained in greater detail below, Option ARM loans were unique among ARM loans in that they give the borrower the option each month to make either a full, interest-only, or a "minimum payment." Option ARMs were WaMu's self-proclaimed "flagship product" and made up the majority of WaMu's "prime" mortgage originations during the Class Period, as well as the majority of the loans in WaMu's "held for investment" portfolio of loans. For example, in the fourth quarter 2006, Option ARM loans comprised $63.6 billion – or 64% – of WaMu's entire $99.5 billion loan portfolio.

47.     WaMu's Option ARM minimum payment option is based on the interest rate charged during the introductory period, and is almost always significantly lower than the loan's fully-indexed payment rate. The fully-indexed rate is calculated using an index rate plus a margin. When the introductory or "teaser" period ends, typically after a period of several months, the contractual interest rate charged on the loan increases to the fully-indexed rate and adjusts monthly to reflect movements in the index. For example, a teaser rate of 1.75% on a $350,000, 30-year loan would yield an initial monthly payment of approximately $1,250. Once the rate adjusts to the fully-indexed rate on the same loan, for example, to a rate of 7.0%, the monthly payment would increase from $1,250 to a monthly payment of approximately $2,329 – an approximate monthly increase for the borrower of over $1,079, or nearly twice borrower's initial payment.

48.     If a WaMu Option ARM borrower continues to make only a minimum monthly payment after the introductory period ends, his or her payments may not be sufficient to cover the interest accrued on his or her loan. This results in so-called "negative amortization" of the Option ARM loan as unpaid interest is deferred and added to the loan's principal balance.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 14
Case No.

During the Class Period, WaMu "capped" the amount of negative amortization on its Option ARM loans from 100% to 125% of the original loan balance. So if a WaMu borrower reaches the negative amortization cap (or at least every 60 months), the borrower's WaMu loan was subject to "recasting," where a new minimum monthly payment is calculated that is sufficient to fully repay the principal balance of the loan, including any theretofore deferred interest, over the remainder of the loan term using the fully-indexed rate then in effect.

49.    The Company falsely represented that it was managing the Company's risk associated with its Option ARM products by ensuring compliance with appropriate underwriting standards, or the Guidelines, appropriately monitoring loan performance and conducting risk modeling procedures, when in fact it was not doing so. For example, although the Company claimed that it did not offer Option ARM loans to subprime borrowers, as alleged in greater detail below, WaMu in fact issued Option ARM loans to borrowers with credit scores as low as 540, when any credit score below 660 is generally considered subprime. Moreover, as discussed below, WaMu inappropriately underwrote many of its Option ARM loans at the loan's introductory interest rate, rather than, as the Prospectuses continually represent, at the loan's fully-indexed interest rate. In other words, WaMu often qualified its Option ARM borrowers based their ability to pay temporary, very low "teaser" interest rates rather than the much higher interest rates that would be in place for the overwhelming majority of the Option ARM loan term.

50.    WaMu also offered stated-income loans, which are mortgages in which the lender does not verify the borrower's income by examining their pay stubs, W-2s, bank statements, tax documents or other records. Instead, WaMu simply asked the borrower for his or her income and took any such representations at face value. Due to the lack of verification, stated-income loans are particularly risky. While these loans were initially intended for self-employed borrowers with good credit, WaMu extended them even to subprime borrowers. Similarly, "no-doc" or "low-doc" loans refer to loan products offered to borrowers that require little to no

documentation from the borrower. When these loans were extended to borrowers with purportedly good credit who simply did not wish to offer documentation, WaMu referred to them as "Alt-A" loans.

51.    WaMu extended subprime mortgage loans, which are mortgages that are offered to relatively less creditworthy borrowers, and, like the various non-traditional ARM products described above, typically cannot be sold to GSEs such as Fannie Mae and Freddie Mac.

52.    Subprime lending is risky for lenders due to the frequently poor credit histories of subprime borrowers, and the higher interest rates that typically are charged for such loans. The Company falsely stated in its annual SEC filings that it mitigated credit risk in its subprime lending through careful underwriting of these loans.

53.    Although WaMu claimed that it issued the loans described above only to borrowers that WaMu deemed qualified after "rigorous" underwriting for each of these loan products, as a matter of policy the Company in fact actively took undisclosed, unlawful and unsafe measures to increase its volume of such loans.

**B.    The Registration Statement and the Prospectus Supplements Contained Material Misstatements and Omissions of Fact**

54.    The Registration Statement represented that all of the loans which made up the pool of residential, subprime mortgages used to support the Certificates were subject to certain underwriting guidelines which assessed the borrower's creditworthiness, including multi-level reviews of loan applications and appraisals.

55.    The Registration Statement disclosed that the underlying loans were originated and/or acquired by WMB and/or WMMSC. The Registration Statement and each of the Prospectus Supplements contained a general Section setting forth the "Underwriting Standards," or the Guidelines, applied to the loans which made up the Trust:

**Underwriting Standards**

The mortgage loans to be transferred to each trust will be subject to the various credit, appraisal and underwriting standards described herein and in the

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 16
Case No.

prospectus supplement. *The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.* The depositor expects the credit, appraisal and underwriting standards described herein to be continuously revised based on opportunities and prevailing conditions in the residential mortgage market and the market for the depositor's mortgage pass-through certificates, mortgage-backed notes and mortgage trust certificates.

The underwriting criteria applied by the originators of the mortgage loans transferred to a trust may vary significantly among originators. The mortgage loan sellers will generally review only a limited portion of the mortgage loans in any delivery of such mortgage loans for conformity with the applicable credit, appraisal and underwriting standards. For each originator of 20% or more of the mortgage loans transferred to a trust, the accompanying prospectus supplement will describe, to the extent material, the originator's origination program and how long the originator has been engaged in originating assets. The description will include, to the extent material, a description of the originator's experience in originating mortgage loans of the type transferred to the trust and the originator's underwriting criteria for those mortgage loans.

The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated generally in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards.

The depositor anticipates that some of the mortgage loans held by a trust for certain series of securities will have been originated based on underwriting standards and documentation requirements that are less restrictive than for other mortgage loan lending programs. In such cases, borrowers may have credit histories that contain delinquencies on mortgage and/or consumer debts. Some borrowers may have initiated bankruptcy proceedings within a few years of the time of origination of the related loan. In addition, loans held by a trust may have been originated in connection with a governmental program under which underwriting standards were significantly less stringent and designed to promote home ownership or the availability of affordable residential rental property regardless of higher risks of default and losses.

The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral. In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history,

employment history and other related items. Each prospective mortgagor generally will also provide an authorization to apply for a credit report which summarizes the mortgagor's credit history. With respect to establishing the prospective mortgagor's ability to make timely payments, the mortgage loan seller may require evidence regarding the mortgagor's employment and income, and of the amount of deposits made to financial institution where the mortgagor maintains demand or savings accounts. If a prospective mortgagor meets certain eligibility criteria, the mortgage loan seller may waive some of its documentation requirements and may not obtain information about the mortgagor's income and assets or may obtain but not verify such information.

*In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.*

*Certain states where mortgage properties may be located are "anti-deficiency" states, where, in general, lenders providing credit on on-to-four-family properties must look solely to the property for repayment in the event of foreclosure. See "Legal Aspects of the Mortgage Loans—Anti-Deficiency Legislation and Other Limitation on Lenders". Underwriting standards in all states (including anti-deficiency states) will require that the underwriting officers be satisfied that the value of the property being financed, as indicated by the independent appraisal, currently supports and is anticipated to support in the future the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.*

In the case of a mortgage loan secured by a leasehold interest in a residential property, commercial property or mixed-use property the title to which is held by a third party lessor, the mortgage loan seller, or another party on its behalf, will be required to warrant, among other things, that the remaining term of the lease and any sublease be at least five years longer than the remaining term of the mortgage loan.

For any loan insured by the FHA, the mortgage loan seller is required to represent that the FHA loan complies with the applicable underwriting policies of the FHA. See "Description of Primary Insurance Policies—FHA Insurance." For any loan guaranteed by the VA, the mortgage loan seller will be required to represent that the VA loan complies with the applicable underwriting policies of the VA. See "Description of Primary Insurance Policies—VA Guarantees." The recent foreclosure or repossession and delinquency experience with respect to mortgage loans serviced by the servicer or, if applicable, the master servicer or a significant sub-servicer will be provided in the related prospectus supplement.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 18
Case No.

*See* WMAAC, April 9, 2007, Form S-3/A at 44-46. (Emphasis added).

56.    The Prospectuses further disclosed and represented that all the underlying loans were subject to underwriting guidelines which varied in the levels scrutiny depending on the borrower, yet all of which stressed homeowner credit-worthiness and ***in most cases, full documentation would be required from the borrower prior to being approved for a loan:***

## UNDERWRITING OF THE MORTGAGE LOANS

*General*

*The sponsor's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some mortgage loans are manually underwritten, in which case an underwriter reviews a loan application and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms stated in the loan application. Some mortgage loans are underwritten through the sponsor's automated underwriting system, described below.*

Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and credit history. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history. In the case of some mortgage loans originated under the sponsor's streamline documentation programs (described below), the prospective borrower is not required to provide certain financial information, including information about income and assets.

*Evaluation of the Borrower's Repayment Ability*

*In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.*

*Evaluation of the Adequacy of the Collateral*

*The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines.*

*At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.*

### Documentation Programs

Each mortgage loan has been underwritten under one of three documentation guidelines for verification of the borrower's stated income and assets. Under the sponsor's full/alternative documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form or, in the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required. Under the full/alternative documentation program, the borrower's stated assets are verified through receipt of the borrower's two most recent bank or brokerage statements. In addition, the borrower's employment may be verified with the employer by telephone or by other independent means.

The sponsor's low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. It is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores. Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone. The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion). Assets may be verified for higher risk transactions and when exceptions are approved, such as when specific loan-to-value ratios or loan amount limits are exceeded.

The sponsor has several "streamline" documentation programs under which the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified. Eligibility criteria vary but may include minimum credit scores, maximum loan amounts, maximum debt-to-income ratios and specified payment histories on an existing mortgage loan (generally, a history of timely mortgage payments for the past twelve months, or for the duration of the mortgage loan if less than twelve months old) or on other debt. Purchase loans as

well as refinance loans may be eligible under the streamline documentation programs. For some mortgage loans that qualify under these programs, the borrower's income and assets are not required to be obtained. For some other mortgage loans that qualify under these programs, the borrower's income and assets are obtained but not verified, the borrower's employment is verified with the employer by telephone, and the borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion).

***A credit report for the borrower generally is required for all mortgage loans underwritten under the sponsor's full/alternative and low documentation programs, and for all but a small percentage of mortgage loans underwritten under the sponsor's streamline documentation program.***

WaMu 2007-OA4 Prospectus Supplement, dated April 24, 2007 at S-38; *see also, generally,* WaMu 2007-OA5 Prospectus Supplement, dated May 22, 2007, at S-33; WMALT 2007-OA5 Prospectus Supplement, dated June 25, 2007, at S-35. (Emphasis added.)

57.    The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the WAMU Certificates originated by WMB were not in accordance with the stated credit, appraisal and underwriting standards set forth above.

58.    Specifically, the Registration Statement set forth *Streamlined Underwriting Criteria,* as set forth in ¶63, in conjunction with its *Automated Underwriting System* which the Company claimed was based mainly on the borrower's credit report and credit score.

**Automated Underwriting System**

Some mortgage loans originated through the sponsor's retail and wholesale lending divisions have been underwritten in whole or in part through the sponsor's proprietary automated underwriting system, known as Enterprise Decision Engine or "EDE". Based on the borrower's credit report and the information in the borrower's loan application, the system either (a) approves the loan subject to the satisfaction of specified conditions, which may include the receipt of additional documentation, or (b) refers the loan application to an underwriter for manual underwriting. In making the underwriting decision, EDE evaluates the borrower's default risk based on both the credit score and the characteristics of the loan. The sponsor has been using EDE for underwriting of mortgage loans since January 2005. The version of EDE used by the sponsor through October 2006 was developed based on a statistical analysis of the past performance of approximately 193,000 mortgage loans originated by the sponsor for its own portfolio between 1998 and 2001. The version of EDE used by the sponsor since October 2006 was developed based on a statistical analysis of the

past performance of approximately one million mortgage loans originated by the sponsor between 1998 and 2002. The sponsor has also used in the past, and currently uses, other automated underwriting systems. All or some of the mortgage loans owned by the Trust may have been underwritten through EDE or other automated underwriting systems.

**Quality Control Review**

The sponsor's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated mortgage loans on a regular basis.

WaMu 2007-OA4 Prospectus Supplement, dated April 24, 2007 at S-40; *see also, generally,* WaMu 2007-OA5 Prospectus Supplement, dated May 22, 2007, at S-35; WMALT 2007-OA5 Prospectus Supplement, dated June 25, 2007, at S-36.

59.    The statements in the preceding paragraph contained misstatements and material omissions including that "credit risk" and "quality control" were materially disregarded, whether manually or via modifying the criteria of the automated system, in favor of generating sufficient loan volume to complete the massive Certificate securitizations as alleged herein and as set forth below.

60.    Each Offering Prospectus, which incorporated the language of the Registration Statement, set forth the applicable policy for granting *Exceptions* to certain borrowers that did not meet the applicable underwriting standards:

**Exceptions To Program Parameters**

*Exceptions to the sponsor's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.*

*See* WaMu 2007-OA4 Prospectus Supplement, dated April 24, 2007 at S-40; *see also, generally,* WaMu 2007-OA5 Prospectus Supplement, dated May 22, 2007, at S-35; WMALT 2007-OA5 Prospectus Supplement, dated June 25, 2007, at S-36.

61.    The statements in the preceding paragraph contained misstatements and material omissions including that the "guidelines" for determining exceptions were materially disregarded in favor of generating sufficient loan volume to complete the massive Certificate securitizations

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 22
Case No.

1  as alleged herein and as set forth below.

2  **C.    Disclosures Relating To WMB's Deficient Lending Practices**

3       62.    WMAAC is a wholly owned subsidiary of WMB.  WMB was one of the top U.S.

4  lenders which offered home loans to the public.  WMB operated as one of the nation's largest

5  and most successful mortgage finance companies until its massive exposure to subprime and alt-

6  A mortgage loans placed the company in the midst of the growing crisis in United States

7  mortgage lending in late 2007 and 2008.

8       63.    As the real estate market in this country softened and interest rates increased,

9  WaMu began to feel the pressures which ultimately resulted in the collapse of the subprime

10 markets.  In April 2007, WaMu reported a 20% decline in the Company's first quarter 2007

11 profit.  Kerry Killinger, WaMu's CEO, warned of "unprecedented deterioration in the subprime-

12 mortgage market, but stated that WMB's home-lending unit would become profitable again by

13 year-end.   Throughout 2007, WMB kept pushing ever-increasing sub-prime mortgage loan

14 volume through its system by loosening the Company's underwriting practices and introducing a

15 growing percentage of higher risk mortgage products, including adjustable-rate, interest-only

16 loans and "stated income" loans, where even W-2 wage earners did not have to bother verifying

17 their stated income levels.

18      64.    According to the Wall Street Journal, the SEC announced in November 2007 that

19 it was initiating an investigation into how WaMu handled and reported on mortgage loans that

20 may have been based on inflated home appraisals. The SEC's inquiry is in its infancy and

21 involves several possible issues, including whether Washington Mutual accurately disclosed to

22 investors of mortgage-backed securities how its loans were appraised as well as whether

23 Washington Mutual properly accounted for its loans in financial disclosures to its investors. That

24 same month Attorney General Cuomo announced his office had filed suit against First American

25 and eAppriaselIT alleging that WaMu handpicked appraisers and otherwise manipulated the

26 appraisal process through eAppraiselIT (a wholly owned subsidiary of First American) to

increase values in appraisal reports related to WaMu loans. *See* ¶¶138-151, *infra.*

65.    By December 2007, shares of Washington Mutual Bank had hit an 11-year low, as the Company announced, according to the Seattle Times, that it would be cooperating with an SEC inquiry stemming from allegations by the New York State Attorney General Andrew Cuomo that WMB had made mortgage loans based on improperly inflated home loans appraisals.

66.    Not long after this announcement, WaMu announced that the Company had posted its first annual loss since the mid-1980's due to a huge loss in the fourth quarter of 2007 of $1.87 billion.

67.    Following these announcements, the price of WaMu Certificates dropped dramatically from over $1.00 face value to just over $.09175 as of January 31, 2008.

68.    On March 3, 2008, Fitch Ratings downgraded $2.3 billion worth of WaMu mortgage pass-through certificates backed by first lien subprime mortgages originated by WaMu. Fitch based its downgrade on "the deteriorating performance of [WaMu's mortgage] pools from 2007, 2006 and late 2005 with regard to continued poor loan performance and home price weakness."

69.    On March 6, 2008, Standard & Poor's downgraded the Company's long-term credit rating to "BBB" from "BBB+" because of credit concerns. Similarly, Dominion Bond Rating Service Limited ("DBRS") downgraded all long-term debt ratings of WaMu and its subsidiaries to BBB (high) from A (low) citing concerns that "credit losses in the Company's residential mortgage portfolio will continue to increase at an accelerated pace given the fact that WaMu's portfolio has significant exposure to high loan-to-value second mortgages and to the regions that have experienced the most significant depreciation in house prices (such as California and Florida)." At the same time, DBRS also lowered its short-term debt ratings of WaMu from R-2 (high) to R 1 (low). In lowering the Company's debt ratings, DBRS noted that the "trend on all ratings remains Negative."

70.    On March 7, 2008, The Wall Street Journal reported that WaMu was approaching private-equity funds, sovereign-wealth funds, and other investors about possible cash infusions. On that same day, Merrill Lynch stated in a report that it expected the Company to report losses of as much as $11.2 billion through 2009 as more borrowers defaulted on home loans.

71.    Thereafter, on March 7, 2008, Fitch Ratings lowered it ratings on the Company citing "a variety of internal and external sources" who predicted that WaMu's first quarter 2008 earnings, along with earnings of other United States banks, will show "rapid deterioration" in its home equity loans portfolio.  In addition, Fitch pointed out that "[a]pproximately 37% of WM's total loan portfolio comprises residential mortgage and home equity loans in California," a state where properties "appear to be deteriorating at a faster pace than those in more stable markets."

72.    On March 14, 2008, Moody's downgraded the Company's senior unsecured debt rating from Baa2 to Baa3, one level above junk status.  In lowering its rating, Moody's explained that it "believes that remaining lifetime losses on [WaMu's residential mortgage loan] portfolio will be higher than previously expected" and that "WaMu's required provisioning is likely to be greater than $12 billion and that full year 2008 net losses could eliminate the company's approximately $6 billion capital cushion above regulatory well capitalized minimums." Moody's also placed a negative outlook on all WaMu entities.

73.    On March 27, 2008, Lehman Brothers issued a report setting forth revised estimates for the Company's 2008 financial results, including an earnings loss of $2.84 per share and a loan loss provision increase to $10 billion.  The report also estimated that the Company would need to set aside $5 billion in 2009 for loan losses, and would incur $6 billion in charge-offs in 2008 and $7 billion in charge-offs in 2009.

74.    In the wake of these announcements, the price of the WaMu Certificates plunged to only $0.6570 on the dollar, according to the Plaintiff's end-of-month account statement for the month ending March 31, 2008.

75.    On April 8, 2008, an investor group led by David Bonderman's TPG pumped $7.2

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 25
Case No.

billion into WaMu, getting just over 50 percent of the Company at $8.75 a share.  WaMu announced it would close its approximately 186 remaining stand-alone home-loan offices, laying off 2,600 to 3,000 workers.

76.     With the news of this infusion of much needed outside capital into the Company, the price of the WaMu Certificates increased to $0.7380 by the end of April 2008, and as high as $0.7797 by May 31, 2008, according to the Plaintiff's monthly account statements for those periods.

77.     Nevertheless, on June 9, 2008, the public gained a much fuller understanding of the magnitude and severity of the loss exposure facing WaMu.  On this date, UBS Investment Research published a detailed analyst report, concluding, after an "extensive credit analysis of WM's balance sheet," that cumulative losses on WaMu's mortgage portfolio will likely total close to $21.7 billion through 2011, between 12.5 to 44% greater than the loss guidance of $12 to $19 billion that the Company provided to the market in April 2008.  Moreover, with respect to its $21.7 billion loss estimate, UBS observed that it might still be too low, stating:  "The attributes of WM's remaining loan portfolio and broader economic weakening mean our bias is that losses could be worse than our projection."  This report also estimated that WaMu would record $24.2-$24.7 billion in incremental loan loss provisions between now and 2010.

78.     Thereafter, on June 24, 2008, Lehman Brothers issued a report predicting that WaMu would suffer mortgage losses in excess of the Company's April 2008 loss guidance of $12 to $19 billion over the next 3 to 4 years.  Specifically, Lehman Brothers' report estimated that WaMu's "lifetime real estate mortgage losses will be in the $21 billion to $28 billion range."

79.     WaMu then announced that it would be cutting another 1,200 jobs at its Seattle, Washington headquarters.

80.     On July 14, 2008, Lehman Brothers issued another analyst report, further confirming its estimate of $21 billion to $28 billion for WaMu's lifetime real estate mortgage losses and predicting that "WM will take a $4B provision in the 2Q08, building reserves to

$6.9B, producing another large loss for the quarter." Moreover, the report estimated that WaMu would report a loss of $1.48 per share in the second quarter because: "As Washington Mutual builds reserves to cover these losses, it should remain unprofitable until credit costs normalize" around the second half of 2009.

81.    On that same day, Ladenburg Thalmann analyst Richard Bove issued a report questioning WaMu's financial viability and ability to stay afloat. In particular, Bove reported that WaMu was on the edge of "the danger zone."

82.    On July 14, 2008, in an attempt to mitigate any further drops in the price of its common stock – which could have dire consequences for the thrift's survival – WaMu issued a press release, claiming that the Company's was sufficiently capitalized and had excess liquidity of more than $40 billion. The Company's mitigation efforts were successful. Nothing could have been further from the truth.

83.    On July 22, 2008, and less than ten days after it falsely calmed concerns about the Company's financial strength, WaMu once again shocked the market. Specifically, WaMu announced its second quarter 2008 financial results, including that the Company suffered a net loss of $3.3 billion, more than 65% greater than the Company's first quarter 2008 net loss of $1.14 billion, driven by a significant increase in its loan loss reserves. The Company further announced that it increased its loan loss reserves by $3.74 billion to $8.46 billion and that it took a $5.9 billion loan loss provision in the quarter, an increase of 40% from the $3.5 billion provision that the Company recorded in the first quarter 2008. In explaining its increased loan loss provision, the Company stated that, "approximately one third of the second quarter provision for loan losses related to significant changes in key assumptions the company used to estimate incurred losses in its loan portfolio." Specifically, the Company shortened the time period used to evaluate defaults for its prime mortgage portfolio to one year from three years "to reflect the evolving risk profile of the loan portfolio and adjusted its severity assumptions for all single family mortgages to reflect the continuing decline in home prices."

84.    In addition, WaMu announced that its unpaid mortgages, foreclosed homes and other nonperforming assets continued to increase during the second quarter.  For example, WaMu stated that its net charge-offs rose to $2.17 billion from $1.37 billion in the prior quarter and nonperforming assets increased $2 billion, representing 3.62% of total assets compared with 2.87% at the end of the prior quarter.  WaMu also announced that it expected cumulative losses in its residential mortgage portfolio to total $19 billion, the high end of its previous guidance, and that 2008 would be the peak year for provisioning.

85.    Also on July 22, WaMu held a conference call to discuss the Company's second quarter 2008 financial results.  Killinger and Tom Casey, WaMu's CFO, participated in the call along with WaMu's new Chief Enterprise Risk Officer John McMurray.  During the call, Killinger, Casey and Murray reviewed the results set forth in the Company's press release.  They also explained that, in 2008, the Company's Option ARM loans experienced the fastest rise in delinquency rates and that they expected "other prime loans, to follow Option ARMs closely." According to McMurray, home equity loans and subprime mortgages had experienced high delinquency rates during the late 2006 to late 2007 time period.  Moreover, during the call, the Company announced that it "significantly reduced our production of new mortgages and tightened underwriting standards against our loan portfolio."  Similarly, the Company also announced it had "eliminated negatively amortizing products including the Option ARM from our product line."

86.    Indeed, Dominion Bond Rating Service Limited and Standard & Poor's downgraded WaMu's ratings.  Moody's placed WaMu and its bank subsidiary on review for a downgrade to junk status.  Piper Jaffray downgraded WaMu to "Sell" and Merrill Lynch cut the Company's rating to "Underperform."

87.    Since the Offerings were consummated, WaMu and WMB's true deficient lending practices have come to light, which brought about WaMu's filing for Chapter 11 Bankruptcy protection on September 26, 2008, and federal regulators seizure of the assets of the

1    bank and large scale sell-off of assets to JPMorgan.

2      88.    Furthermore, the Certificates have been damaged significantly due to the Ratings

3    Agencies downgrades of substantially all of the Certificates' credit ratings to below investment

4    grade.

5    **D.**     **WCC Plays Major Role in the Collapse of the Subprime Market**

6      89.    WCC played a prominent role in rise and fall of the U.S. subprime mortgage

7    market, most importantly as part of the Division of the largest commercial bank failure in

8    history. Since 2002, WaMu has been going directly to Wall Street with its products securitized

9    through its Capital Markets Division, WaMu Capital Corp. In 2005, WCC was officially made a

10    wholly-owned subsidiary of WMB. WCC has helped enabled WaMu to issue billions in asset-

11    backed securities without obtaining the assistance of outside investment bankers.

12      90.    In connection with the Offerings, WCC failed to conduct meaningful due

13    diligence, including in connection with the underwriting standards used to originate the

14    Certificate collateral.

15      91.    WaMu announced in an article in the *New York Times,* in December 2007, that it

16    would be closing its Capital Markets division and subsidiary, WCC as a cost-cutting measure.

17      92.    The First American Complaint provides as background the following description

18    of the structure of the home lending business and the reasons why banks that originate mortgages

19    no longer have an incentive to ensure that home loans are predicated upon fair and accurate

20    appraisals"

21        18.    Because of the importance of appraisals in the home lending market, state
        and federal statutes and regulations require that appraisals be accurate and

22        independent. The Uniform Standards of Professional Appraisal Practice
        ("USPAP") are incorporated into federal and New York law. See 12 C.F.R. §

23        34.44; 19 NYCRR § 1106.1. USPAP requires appraisers to conduct their
        appraisals independently: "An appraiser must perform assignments with

24        impartiality, objectivity, and independence, and without accommodation of
        personal interests. In appraisal practice, an appraiser must not perform as an

25        advocate for any party or issue." USPAP Ethics Rule (Conduct).

26        19.    Federal law sets independence standards for appraisers involved in

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 29
Case No.

federally regulated transactions. See 12 U.S.C. §§ 3331, et seq. The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

20.     In 2005, federal regulators including the OTS [Office of Thrift Supervision] published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal independence, the document provides:

> 3. Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?

> Answer:     The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff. Loan production staff should not select appraisers.

* * *

> 5. When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?

> Answer:     Yes, loan production staff may use a revolving, board approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process. . . . Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.

21.     Generally, USPAP and the federal laws and regulations which incorporate the provisions set forth above, preclude lenders from exerting influence over the appraisal process or appraisal value.

## COUNT I

### VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### (Against Defendants WMAAC, the Individual Defendants and WCC)

93.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-92, above.

94.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and asserted on behalf of all other members of the Class who purchased or acquired WaMu Certificates on or traceable to the Offerings.

95.    Defendant WMAAC is the registrant for the Offerings and filed the Registration Statement and Prospectuses as the issuer of the WaMu Certificates, as defined in Section 11(a)(1) of the Securities Act.

96.    The Individual Defendants were officers and/or directors of WMAAC at the time the Registration Statement were filed in connection with the Offerings became effective, and at the time of the issuance of the Prospectuses, and with their consent were identified as such therein.    The Individual Defendants are liable for the misstatements and omissions in the Registration Statement alleged herein under Section 11(a)(1) of the Securities Act.

97.    Defendant WCC served as the Underwriter for the Offerings and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).    As such, the Underwriter Defendant participated in the solicitation, offering, and sale of the WaMu Certificates to the investing public pursuant to the Registration Statement and the Prospectuses.

98.    The Registration Statement and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.    The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

99.    These Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in

the Registration Statement and Prospectuses were true, did not omit any material fact, and were not materially misleading.

100.    Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Registration Statement and the Prospectuses.

101.    Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Registration Statement and the Prospectuses, for which they are entitled to compensation.

102.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering.

## COUNT II

### VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT
### (Against Defendants WMAAC, the Individual Defendants and WCC)

103.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-102, above.

104.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against Defendants WMAAC, the Individual Defendants and WCC.

105.    By means of the Registration Statement and Prospectuses, and by using means and instruments of transportation and communication in interstate commerce and of the mails, the Defendants through the Offerings sold WaMu Certificates to Plaintiff and other members of the Class.

106.    Defendants WMAAC, the Individual Defendants and the WCC each successfully solicited these purchases, motivated at least in part by their own financial interest.   These Defendants each reviewed and participated in drafting the Prospectuses.   Through ensuring the successful completion of the Offerings, the Underwriter Defendant obtained substantial underwriting fees.

107.    The Registration Statement and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

108.    Defendants as "sellers" owed to the purchasers of the WaMu Certificates, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectuses, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

109.    Plaintiff and other members of the Class purchased or otherwise acquired WaMu Certificates pursuant to the defective Registration Statement and Prospectuses.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement and the Prospectuses.

110.    Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.  Class members who have sold their WaMu Certificates are entitled to rescissionary damages.

111.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold WaMu Certificates purchased pursuant and traceable to the Offerings have the right to rescind and recover the consideration paid for their WaMu Certificates and hereby elect to rescind and tender their WaMu Certificates to the Defendants sued herein.  Plaintiff and Class members who have sold their WaMu Certificates are entitled to

rescissionary damages.

## COUNT III

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT
(Against Defendants WMAAC and the Individual Defendants)

112.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-111, above.

113.    This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act and asserted on behalf of all Class members who purchased or acquired WaMu Certificates in the Offerings.

114.    The Individual Defendants at all relevant times participated in the operation and management of WMAAC, WMB, WMMSC and related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of WMAAC and the subsidiaries' business affairs.

115.    As officers and/or directors of WMAAC, the Individual Defendants had a duty to disseminate accurate and truthful information in the Registration Statement and the Prospectuses.

116.    As set forth above, it is alleged that the Registration Statement and Prospectuses issued in connection with the WaMu Offerings contained material misstatements of fact, and omitted facts necessary to make the facts contained therein not misleading, in violation of Sections 11 and 12 of the Securities Act.

117.    Because of their positions of control and authority as senior officers and directors of WMAAC, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.   The Individual Defendants were therefore "controlling persons" of WMAAC within the meaning of Section 15 of the Securities Act.

118.    In addition, because of its sole ownership of the sponsor and servicers of the

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 34
Case No.

Trusts' assets and its control and authority as Parent Corporation, Defendant WMAAC was able to, and did, control the contents of the Registration Statement and the Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. Defendant WMAAC was therefore a "controlling person" of the servicer and seller of the Certificates within the meaning of Section 15 of the Securities Act.

119.    Plaintiff and other Class members purchased WaMu Certificates issued pursuant to the Offerings. The Offerings were conducted pursuant to the Registration Statement and the Prospectuses.

120.    The Registration Statement and Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

121.    Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statement and the Prospectuses.

122.    Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statement and the Prospectuses, for which they are entitled to compensation.

123.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

DORAL BANK PUERTO RICO, on Behalf of
Itself and All Others Similarly Situated,

Plaintiff,

v.

WASHINGTON MUTUAL ASSET
ACCEPTANCE CORPORATION; DAVID BECK;
DIANE NOVAK; THOMAS LEHMANN;
STEPHEN FORTUNATO; DONALD WILHELM;
WAMU CAPITAL CORPORATION; FIRST
AMERICAN CORPORATION and FIRST
AMERICAN EAPPRAISEIT, LLC,

Defendants.

COMPLAINT FOR VIOLATIONS
OF WASHINGTON STATE LAW

Plaintiff alleges the following based upon the investigation of counsel, CMST, which included a review of SEC filings by WMI, WMAAC, WMMSC, WMB, WCC, First American and eAppraiseIT, regulatory filings and reports and advisories about those entities, press releases and other public statements issued by or on their behalf, the complaint filed by the Attorney General of the State of New York against the First American Corporation, the Complaint filed by shareholders of First American Corporation against officers of that Corporation, information readily obtainable on the Internet and their own internal investigation.   Plaintiff's counsel believes that substantial additional evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.   The following allegations are separate and apart from those set forth above which form the basis of Counts I, II and III, all of which are claims do not include any allegations of fraud. The background and substantive allegations set forth above are incorporated herein as indicated.

## VI.    NATURE OF THE STATE LAW ACTION

124.    This is a class action brought by Doral Bank Puerto Rico (defined herein as "Doral" or "Plaintiff") alleging violations of the Washington State Securities Act ("WSSA"), RCW 21.20.010 and 21.20.430(1) and (3), and Washington State Law, on behalf of purchasers of

Washington Mutual Mortgage Pass-Through Certificates Series WAMU 2007-OA4, WAMU 2007-OA5, WAMU 2007-OA6, WMALT 2007-OA4, WMALT 2007-OA5, WMALT 2007-OC1, WMALT 2007-OC2, WMALT 2007-3, WMALT 2006-4 and WMALT 2006-5 (defined previously as the "Certificates" or the "WaMu Certificates") who purchased the Certificates in the Offerings as set forth above.

125.    For the purposes of the within claims, Plaintiff repeats and incorporates ¶¶33-92, as set forth above, unless otherwise indicated.

126.    On November 1, 2007, the Attorney General of the State of New York filed a lawsuit against First American, and First American's real estate appraisal subsidiary, eAppraiseIT (the "First American Complaint"). WaMu was eAppraiseIT's largest customer and it provides real estate appraisal services to WaMu on mortgages and "second lien" home loans, such as home equity loans and home equity lines of credit. According to allegations against First American, during the Class Period, WaMu used only two outside appraisal firms, eAppraiseIT and Lender's Service, Inc. The First American Complaint alleges that beginning in 2006, eAppraiseIT provided over 260,000 appraisals for WaMu.

127.    Andrew Cuomo, the New York Attorney General, alleges in the complaint that beginning in "Summer 2006" WaMu put pressure on eAppraiseIT to increase the appraised value of homes: First American and eAppraiseIT have abdicated their role in providing "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close. eAppraiseIT compromises its independence even while publicly touting that independence, and despite myriad warnings from its senior management team about the illegal collusion inherent in the compromises it is making. Instead of preserving its independence, which would have protected consumers and business customers alike, eAppraiseIT chose to protect only itself. And

1    senior executives at First American, though warned by eAppraiseIT's senior management of its

2    compromised independence, nonetheless directed eAppraiseIT to continue its wrongful conduct.

3    128.    Throughout the Class Period, however, Defendants failed to disclose the undue

4    and improper pressure placed on First American by WaMu executives in attempt to obtain higher

5    appraisal values. As stated in the First American Complaint such inflated appraisals create an

6    enhanced risk of "loss of value in a foreclosure proceeding."

7    129.    Defendants' improper appraisal practices during the Class Period rendered the

8    Offering Documents' statements about its compliance with the Guidelines untrue statements of

9    material fact, were since such practices were not disclosed they thus constitute ongoing

10   omissions of material fact related to WaMu's, securitization of mortgage loans into MBS,

11   materially inflating the value of the MBS issued and purchased by Plaintiff and the Class.

## VII.    JURISDICTION AND VENUE

12

13   130.    For the purposes of the within claims, Plaintiff repeats and incorporates ¶¶5-8, as

14   set forth above.

## VIII.    PARTIES

15

16   131.    For the purposes of the within claims, Plaintiff repeats and incorporates ¶¶9-23, as

17   set forth above, except as provided below.

18   132.    Defendant First American Corporation ("First American") is a California

19   corporation and has its executive offices at 1 First American Way, Santa Ana, California 92707-

20   5913. First American, through its subsidiaries, provides business information and related

21   products and services. First American operates in a variety of business sectors, including

22   Information and Outsourcing Solutions that encompasses real estate appraisal services.. First

23   American routinely does business in the State of Washington directly and through its

24   subsidiaries.

25   133.    Defendant First American eAppraiseIT, LLC ("eAppraiseIT") is a wholly-owned

26   subsidiary of First American and has its executive headquarters at 12395 First American Way,

Poway, California 92064. eAppraiseIT provides real estate appraisal services to savings and loans, banks, and other lending professionals. Upon information and belief, during the Class Period, eAppraiseIT regularly conducted business and appraised real estate in the State of Washington.

134. Defendants WMAAC, the Individual Defendants, WCC, First American and eAppraiseIT are collectively referred to from this point on as "Defendants."

## IX.    CLASS ACTION ALLEGATIONS

135. For the purposes of the within claims, Plaintiff repeats and incorporates ¶¶27-32, as set forth above, except as provided below.

136. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the provisions of the WSSA were violated by the Defendants as alleged herein;

b.    whether the Registration Statement and Prospectuses contained material misstatements or omitted statements of material fact; and

c.    whether Defendants' actions constitute common law fraud under Washington State Law;

d.    whether Defendants' actions constitute a civil conspiracy under Washington State Law;

e.    whether Defendants' actions constitute negligent misrepresentation under Washington State Law;

f.    whether Defendants' actions constitute a violation of Washington State's Consumer Protection Act, RCW 19.86.010, *et seq.*;

g.    to what extent the members of the Class have sustained damages pursuant to the respective statutory measures of damages.

## X.    ADDITIONAL SUBSTANTIVE ALLEGATIONS FOR WSSA AND WASHINGTON STATE LAW CLAIMS ONLY

**A.    Washington Mutual's Improper Manipulation of eAppraiseIT to Obtain Infalted Appraisals**

137.    The First American Complaint alleges a complex scheme undertaken by senior Washington Mutual executives to manipulate the value of appraisals provided by eAppraiseIT. The relevant allegations are excerpted as follows:

> 28.   By email dated September 29, 2006, a WaMu executive wrote to eAppraiseIT's senior executives to define the responsibilities of eAppraiseIT's ABMs as to ROVs and value disputes:
>
> > . . . the four appraisers/reviewers would be directly involved in escalations dealing with: ROVs, Valuation issues where the purchase price and appraised value differ with no reconciliations/ justifications by the appraiser, Value cuts which we continue to receive from your third party reviewers (Wholesale), proactively making a decision to override and correct the third party appraiser's value or reviewer's value cut, when considered appropriate and supported . . . .
>
> In this way, from the outset, WaMu sought to use eAppraiseIT to ensure that appraisals did not come in lower than WaMu wanted.
>
> ***
>
> 29.    Almost immediately after WaMu retained eAppraiseIT to provide appraisals in early Summer 2006, WaMu's loan production staff began complaining that the appraisal values provided by eAppraiseIT's appraisers were too low. It was clear, and eAppraiseIT well understood, that WaMu's dissatisfaction was largely due to the fact that eAppraiseIT's staff and fee appraisers were not "hitting value," that is, were appraising homes at a value too low to permit loans to close.
>
> ***
>
> 31. A week later, on August 15, 2006, eAppraiseIT's Executive Vice President advised eAppraiseIT's President that WaMu's loan officers would often pressure WaMu's internal appraisal field managers for an "extra few thousand," or "tell[] them specifically what they needed," or would "ask for several ROVs on the same property." eAppraiseIT's Executive Vice President explained that "[h]aving loan officers ask for a few thousand dollars because it is within the range is something we do not currently do for any client. . . . It is also direct pressure on the appraiser for a higher value without any additional information."
>
> ***

34. During this period, First American was seeking additional business from WaMu in other areas. But WaMu expressly conditioned giving any future business to First American on success with eAppraiseIT. By email dated September 27, 2006, a First American senior executive advised other senior executives at First American and eAppraiseIT about a conversation he had with the President of WaMu Mortgage about long-term business prospects.

The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the money we have on deposit there and our other current business relationships. I told him we would like to expand those relationships. And in exact terms, we would like one half of their flood business, which they currently give 100% to [Corporation A] and their tax business is divided 3 ways among [3 corporations] and that we would like to take [Corporation A's] tax business.

According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship including tax and flood.

\*\*\*

37.    In February 2007, WaMu directed eAppraiseIT to stop using its usual panels of staff and fee appraisers to perform WaMu appraisals. Instead, WaMu's loan origination staff demanded that eAppraiseIT use a Proven Panel of appraisers selected by the loan origination staff, who were chosen because they provided high values.

38.    By email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding the Proven Panel:

> We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers."  . . . We will pay their appraisers whatever they demand. Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV. (Emphasis added)

\*\*\*

41. In February 2007, eAppraiseIT simply capitulated to WaMu's demands. In an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "we have agreed to roll over and just do it." He explained that "we were willing to live with the change if they would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does not mean that they can grab all the fees. They agreed." In other words, for the right price in

fees, eAppraiseIT was willing to go along with the Proven Panel.

***

43.     On March 5, 2007, WaMu confirmed the primary role of its loan origination staff in picking appraisers in a follow-up email, in which it explained that the Proven Appraiser List is being created. This will replace the WaMu preferred list. The initial list of names will be provided by lending with a minimum of two appraisers per area/county. The list will then be reviewed and approved by the Appraisal Business Oversight Team and will be checked against our most recent ineligible list. Final list will be provided to VMC's [vendor management companies]. Majority of work must be assigned to the appraisers on the Proven Appraiser List on a Priority Basis. (Emphasis added).

***

48.     On April 17, 2007, eAppraiseIT's President wrote to senior executives at First American, describing the issues with WaMu as follows:

In short, the issues are using their designated appraisers as mandated by the WaMu production force at 20% gross margin and bypassing our panel. We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation. (Emphasis added).

***

57.     On May 11, 2007, eAppraiseIT's Executive Vice President wrote to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel. They are selecting the appraisers and calling them 'proven' appraisers. These appraisers are being chosen by their sales force. First American eAppraiseIT (FA eAppraiseIT) is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using a Proven Panel because of the "low values" from eAppraiseIT's appraisers.

***

71.     In one specific example, in or about December 2006, a particular appraiser ("Appraiser A") was approved to be an appraiser on the Proven Panel. From January 25, 2007 through May 7, 2007, Appraiser A conducted five appraisals for eAppraiseIT with respect to WaMu properties. For each appraisal, WaMu requested a reconsideration of value. In each instance, Appraiser A refused to increase the value.

72.     Shortly thereafter, Appraiser A was removed from the Proven List and placed on the WaMu inactive list. He was then told by a WaMu sales assistant that he was removed from the panel because he did not increase values in response to these reconsiderations of value. This same WaMu sales assistant told Appraiser A that many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high value to permit the loans to close.

73.    On May 30, 2007, Appraiser A wrote to eAppraiseIT regarding the WaMu Proven Panel. In the email, Appraiser A wrote that: "We continued to provide this high level of service when eAppraiseIT took over as appraisal management. With no explanation or warning, I was removed from the assignment rotation in mid April of this year. I respectfully ask to be reinstated as an active preferred appraiser."

74.    Following receipt of Appraiser A's email, on May 30, 2007, an eAppraiseIT Appraisal Specialist wrote to eAppraiseIT's Executive Vice President, Chief Operating Officer and Chief Appraiser:

> I was working with two good, solid long-time wonderful appraisers in NY and CT until right after the WaMu Proven Panel was formed. They were both removed very soon after for no apparent reason. We were having value issues, however, I felt their work was very defendable and supportable, and kept copious notes on our dealings. They have continued to keep in touch with me, in order to find out why they were removed from the panel. (Emphasis added).

75.    On May 31, 2007, eAppraiseIT's Chief Appraiser replied:

> First he was on the Master List so put on WAMU Proven and then as the list went around he was REMOVED. The probability that a loan officer requested him to be removed is pretty high I think because that is what they did with the Master List; they sent it out to Lending to choose.

76.    To date, Appraiser A remains off the Proven Panel.

***

81.    Similarly, on April 17, 2007, a third appraiser ("Appraiser C") wrote to eAppraiseIT that:

> This is the second Wamu Appraisal quality assurance issue I have received from Wamu in the past 2 months. Both as a result of an appraisal I completed that did not come in to their predetermined value for a "valued" Wamu client. I was pressured for 2 weeks to change both my value and the conditions of my appraisal report . . . both of which were violations of USPAP, FANNIE MAE and the Supplemental Standards I am required to observe and am bound by my license to complete. Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed that did not reach a pre-determined value. I feel that Wamu is in process of "blacklisting" me as an approved Wamu appraiser by going after each appraisal I complete and looking for violations." (Emphasis added).

82.    Appraiser C wrote this email after having been pressured and harassed to

increase values on two appraisals, after WaMu had requested ROVs and she had declined to increase the values. Shortly after her refusal to increase these values, she received two "Unacceptable Appraisal Notifications" from WaMu. After having been harassed and targeted with "unacceptable" strikes, she withdrew from WaMu's panel in order to avoid being removed against her will.

***

86.    Further, email exchanges between WaMu and eAppraiseIT show that WaMu repeatedly pushed eAppraiseIT's ABMs to increase appraised values so that loans could close. For example, in one exchange with an eAppraiseIT review appraiser, a WaMu loan officer wrote that "Basically, if we don't get at least the appraised value of $3,650,000 . . . we lose the deal." (Ellipses in original). Earlier that day, this loan officer told eAppraiseIT that "if we don't have a definitive $$ appraised value then the borrower will go to another lender with a higher appraised value of $4mm. Please . . . at least . . . keep this value at the original appraised value of $3,650,000." (Ellipses in original).

87.    On May 23, 2007, eAppraiseIT's Chief Appraiser described these comments as "a clear picture of Lender Pressure on behalf of WaMu."

88.    eAppraiseIT received other communications from WaMu in which WaMu attempted to influence the appraised values of specific properties. For example, on May 24, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's President that: "We have received in the past, and now most recently with the Sag Harbor event (which incidentally just happens to be a New York property), communications where it could be viewed that EA did experience some level of influence to increase a value beyond that which we concluded in our own analysis was not supported."

89.    eAppraiseIT's internal appraisal log entries indicate that its Review Appraisers and ABMs increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close. For the period of November 2006 to May 2007, there were 8 desk reviews performed by ABMs and 1 desk review performed by the Appraisal Specialist relating to properties in New York, all of which were for WaMu. The appraised values were increased in each of the 9 desk reviews completed, as follows: from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000.

90.    This level of contact between WaMu's loan production staff and eAppraiseIT's ABMs is prohibited by USPAP's independence requirements and by state and federal law.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 44
Case No.

**B.    Washington Mutual's Business and Use of Inflated Appraisals**

138.    The Company's Home Loan business is described as follows in the 2006 Form 10-K:

> The principal activities of the Home Loans Group include: (1) originating and servicing home loans; (2) managing the Company's capital market operations–which includes the buying and selling of all types of mortgage loans in the secondary market; (3) the fulfillment and servicing of the Company's portfolio of home equity loans and lines of credit; (4) originating and purchasing mortgage loans to higher risk borrowers through the subprime mortgage channel; (5) providing financing and other banking services to mortgage bankers for the origination of mortgage loans; and (6) making available insurance-related products and participating in reinsurance activities with other insurance companies.
>
> The segment offers a wide variety of real-estate secured residential loan products and services primarily consisting of fixed-rate home loans, adjustable-rate home loans or "ARMs", hybrid home loans, Option ARM loans and mortgage loans to higher risk borrowers through the subprime mortgage channel. Such loans are either held in portfolio by the Home Loans Group, sold to secondary market participants or transferred through inter-segment sales to the Retail Banking Group. The decision to retain or sell loans, and the related decision to retain or not retain servicing when loans are sold, involves the analysis and comparison of expected interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the expected servicing fees, the size of the gain or loss that would be realized if the loans were sold and the expected expense of managing the risk related to any retained mortgage servicing rights.
>
> As part of its capital market activities, the Home Loans Group also generates both interest income and noninterest income through its conduit operations. Under the conduit program, the Company purchases loans from other lenders, warehouses the loans for a period of time and sells the loans in the form of whole loans, private label mortgage-backed securities or agency-guaranteed securities. The Company recognizes a gain or loss at the time the loans are sold and receives interest income while the loans are held for sale. The Company also provides ongoing servicing and bond administration for all securities issued.

139.    Through its home loan operating segment, Washington Mutual provides financing to homeowners in the form of home mortgages and "second-lien" products such as home equity loans and home equity lines of credit. These loans are either held by Washington Mutual "in portfolio" or sold to investors - "home loans held for sale."

140.    Loans held for sale are typically pooled and so called "structured finance" securities, such as "mortgage backed-securities" (MBS), "collateralized debt obligations" (CDO)

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 45
Case No.

and "collateralized mortgage obligations" (CMO), are issued against that pool. In determining the interest rates and prices that such securities will be issued at, the underwriters and purchasers try to assess the default risk of the underlying mortgages.

141.   An important measure of the risk in a home loan is the loan-to-value ratio ("LTV"), which is the measure of equity retained by the homeowner. A homeowner's equity is generally the difference between the value of the home and the amount of borrowing the homeowner has taken out that is collateralized by the home. For example, if a home has a value of $100,000 and a homeowner has borrowed $80,000 against that home, the homeowner has $20,000 in equity. The "loan-to-value" ratio in that situation is 8:10, or 80%. The value of the appraisal in the loan file is critical to investors in determining the LTV and the associated risk of default in the loan.

142.   In its Form 10-K for 2006, Washington Mutual acknowledges that the less equity a homeowner has in his or her home, the greater the credit risk to the borrower:

> Home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

143.   In the prior example, the homeowner's property was valued at $100,000. If that homeowner wanted to borrow an additional $20,000 against the value of the home, it may not be able to because such additional borrowing would reduce their equity to 0% and would result in an LTV of 1:1. This loan would be extremely high risk and the bank may not be able to sell it or would only be able to sell it at a very steep discount or very high interest rate.

144.   Washington Mutual also acknowledges that it uses the LTV to determine the default risk of loans it holds in portfolio. The risk of default is expressed on the Company's balance sheet as a reserve which reduces the carrying value of the loan. Loans with high LTVs carry greater risk of nonperformance and thus must carry higher reserves.

145.   Washington Mutual's practice of inducing appraisers to overvalue real property

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 46
Case No.

1  causes increased risk of loss both for loans held in Washington Mutual's portfolio and for loans

2  securitized and sold to third parties.

3      146.    In certain circumstances, investors who purchase loans from Washington Mutual

4  have recourse against it if the borrower defaults or if there are errors or misrepresentations made

5  in the origination or sale of the loan. In its 2006 Form 10-K, Washington Mutual explained this

6  as follows:

> In the ordinary course of business, the Company sells loans to third parties and in
> certain circumstances, such as in the event of early or first payment default,
> retains credit risk exposure on those loans. The Company may also be required to
> repurchase sold loans when representations and warranties made by the Company
> in connection with those sales are breached. When a loan sold to an investor fails
> to perform according to its contractual terms, the investor will typically review
> the loan file to search for errors that may have been made in the process of
> originating the loan. If errors are discovered and it is determined that such errors
> constitute a violation of a representation or warranty made to the investor in
> connection with the Company's sale of the loan, then the Company will be
> required to either repurchase the loan or indemnify the investor for losses
> sustained if the violation had a material adverse effect on the value of the loan.

147.    The Registration Statement and Prospectus Supplements stated several risk

factors which may affect the value and/or return to investors from their investment in the

Certificates. *See, e.g.*, WAMU Series 2007-OA4 Prospectus Supplement, dated April 24, 2007,

at S-20. ***However, they included no cautionary language regarding the risk of inflated, non-
independent appraisals of the underlying mortgaged homes.***

148.    Inflated, non-independent appraisals of homes that serve as collateral for loans

that are securitized, are among the errors or misrepresentations that would allow the purchaser of

a loan to have recourse against Washington Mutual - creating undisclosed contingent risk of loss

for Washington Mutual in the event it is required to repurchase non-performing loans at face

value.

149.    Inflated, non-independent appraisals also cause the present value of the loans held

in portfolio by Washington Mutual to be overstated, on a net basis. As described in further detail

below, Washington Mutual's 2006 Form 10-K states that the "loan-to-value ratios and

borrowers' credit scores are key determinants of future loan performance" and that it uses the loan-to-value ratio in determining risk of default or non-performance on loans held in portfolio. Inflated appraisal values will cause the loan-to-value ratios used by Washington Mutual to establish reserves to be distorted - resulting in inflated values placed on Certificates backed by mortgage loans on properties with fraudulent appraisals.

**C.    Washington Mutual's Relationship With First American's eAppraiseIT**

150.    According to the First American Complaint, Washington Mutual initiated a business relationship with eAppraiseIT on the pretense that this would create an independent appraisal process:

> 25.    WaMu retained eAppraiseIT in Spring 2006, after WaMu decided to close its internal appraisal office and terminate its staff appraisers. WaMu quickly became eAppraiseIT's largest client, providing nearly 30 percent of its business in New York. Over the course of the business relationship, eAppraiseIT conducted more than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.

> 26.    Initially, eAppraiseIT employed a combination of in-house staff and third-party fee appraisers, including some "preferred appraisers" identified by WaMu, to conduct appraisals of residential property for WaMu. eAppraiseIT also hired approximately 50 former WaMu employees as staff appraisers and Appraisal Business Managers ("ABMs") and – at WaMu's request – gave the ABMs the authority to override and revise the values reached by third-party appraisers. One-third of eAppraiseIT's staff appraisers are former WaMu employees, and all of the ABMs are former WaMu employees. eAppraiseIT's President advised the leadership of First American that "we have hired and on boarded many of Wamu's regional mangers and appraisers last week. They will be instrumental in our relational and operational success with the sales force."

> 27.    Under contractual arrangements between WaMu and eAppraiseIT, WaMu can challenge an appraiser's conclusions by requesting a "reconsideration of value" ("ROV") when WaMu disagrees with an appraised home value set forth in an appraisal report. Practically speaking, this permits WaMu to ask eAppraiseIT to reconsider and raise the value assigned to a home. Throughout the business relationship, WaMu has frequently ordered ROVs from eAppraiseIT.

**D.    False and Misleading Statements and Material
     Omissions Made During the Class Period**

151.    For the reasons set forth above in ¶¶33-53, 62-92, 138-150, the statements set forth in ¶¶ 54-61, above, made by Defendants were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 48
Case No.

standards as codified under Federal and state laws in the Registration Statement and Prospectus Supplements;

        b.    Defendants inflated the price of the Certificates offered to the public with false and misleading information as to the quality of the underlying collateral and were materially misstated such quality as a result of loans issued against inflated appraisals;

        c.    The underlying assets, provision and mortgage balances were materially misstated as a result of loans issued against inflated appraisals;

        d.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

        e.    The Ratings Agencies were forced to substantially downgrade the credit ratings of the Certificate Tranches, resulting in a precipitous decline in value of the Certificates due to the Defendants' fraudulent practices in overseeing the securitization of the Offerings.

## COUNT IV

### VIOLATIONS OF WSSA, RCW 21.20.010 AND RCW 21.20.430(1) AND (3)
### (Against All Defendants)

152.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-92 and ¶¶138-151, above, except as otherwise indicated.

153.    This claim is brought pursuant to RCW 21.20.010 and RCW 21.20.430(1) and (3), on behalf of the Plaintiff and all Class members who purchased the Certificates which were issued pursuant to the Registration Statement filed with the SEC and the corresponding Prospectus Supplements.

154.    The Certificates sold to Plaintiff and all Class members, although not traded on a national exchange, are "securities" under the securities laws of the State of Washington. Each offer to sell the Certificates was made, directly and indirectly, by WaMu through use of the Registration Statement and corresponding Prospectus Supplements.

155.    During the Class Period, Defendants were artificially inflating appraised values of

mortgages that were securitized and sold Plaintiff and other Class members. In connection with the Certificates, Defendants made and/or substantially contributed to untrue statements of material fact and material omissions regarding, *inter alia,* the risks of investing in the Certificates; the stability of the collateral and credit support underlying the MBS and payment streams to Certificate holders; the Guidelines and appraisal standards used to originate and sell the mortgage loans underpinning the MBS; the Ratings assigned to the MBS; and the LTV ratios of the mortgage loans pooled and sold to Plaintiff and other investors in the Certificates.

156.    The systematic inflation of appraisal values of the properties that secured the mortgages underlying the Certificates constitutes a scheme or artifice, employed by Defendants to defraud Plaintiff and the Class, in conjunction with the offer, sale or purchase of a security, in an effort to enrich Defendants.

157.    Defendants made or caused to be made the misrepresentations and omissions set forth above, disregarding the fact that said misrepresentations were untrue and that they were omitting to state material facts that would have made those facts not misleading. Further, in making these misrepresentations and omissions, Defendants knew or recklessly disregarded the fact that Plaintiff and the members of the Class would rely on the statements to their detriment. Defendants breached their duties of disclosure to Plaintiff and members of the Class by failing to disclose material facts as well as other facts relating to the true state of events as described herein.

158.    Defendants knew or recklessly disregarded the fact that the aforesaid acts, practices and misleading statements and omissions were being made to the public. Defendants acted in concert with each other to commit the fraud and benefited financially from the fraud. Therefore, Defendants are jointly and severally liable under the WSSA for any act or omission committed by Washington Mutual and its affiliates.

159.    The foregoing conduct also constitutes the employment by Defendants of a device and scheme to defraud, as well as acts, practices, and a course of dealing, which operated as a

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 50
Case No.

1    fraud. Defendants engaged in a plan, scheme and unlawful conspiracy and course of conduct,

2    pursuant to which they knowingly and recklessly engaged in acts, transactions, practices and a

3    course of business that operated as a fraud upon Plaintiff and other members of the Class.

4    Defendants made and/or were a substantial contributive factor to various untrue statements of

5    material facts and omitted to state material facts necessary to make the statements made not

6    misleading to Plaintiff and Class members. The purpose and effect of said collusion, plan and

7    scheme was to induce Plaintiff and Class members to invest in the Certificates.

8          160.    At the time of these misrepresentations, omissions and non-disclosures, Plaintiff

9    and members of the Class were not aware of the non-disclosures or that the statements made by

10   Defendants were either untrue or contained misleading omissions. Plaintiff and Class members

11   reasonably relied on the truth and completeness of the material representations made to them.

12         161.    Defendants knew, or should have known, that the LTV ratios and other false and

13   misleading information they provided to Washington Mutual would be shared with and relied

14   upon by the investing public. But for Defendants' substantial contribution to the preparation and

15   dissemination of the false and misleading Registration Statement and Prospectuses for their own

16   financial benefit, the sale of the Certificates could not and would not have been accomplished.

17         162.    As a result of the foregoing, Defendants qualify as a seller of the Certificates to

18   Plaintiff and the members of the Class within the meaning of RCW 21.204.430(1). The acts of

19   all Defendants were a substantial contributive factor in the sales transactions. Consequently,

20   Defendants are all jointly and severally liable as a seller.

21         163.    As a result of the foregoing, Defendants are also secondarily liable under RCW

22   21.204.430(3) by directly or indirectly controlling a liable seller and by materially aiding the

23   fraudulent scheme. Consequently, Defendants are jointly and severally liable for fraud and

24   misrepresentation in the sales of the Certificates.

25         164.    As a result of the forgoing, Plaintiff and Class members have suffered substantial

26   damages and hereby tender their Certificates in exchange for full repayment of their investment

plus interest and attorney fees and expenses.

## COUNT V

### COMMON LAW FRAUD
### (Against All Defendants)

165.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-92 and ¶¶138-164, above, except as otherwise indicated.

166.    As alleged herein, Defendants made and/or were a substantial contributive factor to material misrepresentations and failed to disclose material facts to Plaintiff and other Class members regarding the nature of the appraisal standards employed in connection with mortgage loans that were securitized and pooled in the Trusts. Defendants knowingly and/or recklessly engaged and participated in a continuous course and scheme of deceitful conduct to inflate the value of appraisals to close more home loans so that they could increase the volume and value of the loans they were selling to Plaintiff and the Class as securitized MBS. Defendants engaged in acts, practices and a course of conduct that included misrepresenting the true nature of appraisals performed on properties serving as collateral for the MBS sold to Plaintiff; and they made, or participated in making, untrue and misleading statements of material fact and omitted to state material facts necessary to make their statements not misleading. The purpose and effect of these deceitful schemes was to induce Plaintiff to rely upon the overstated ratings, understated LTV ratios and other false information regarding the loan underwriting and appraisal procedures employed by Defendants.

167.    Defendants deliberately and recklessly artificially inflated the value of properties to allow WaMu to represent favorable LTV ratios for the mortgage loans underpinning the Certificates.

168.    Defendants had actual knowledge of the misrepresentations and omissions of material facts, or acted with reckless disregard for the truth of those misrepresentations made in connection with the offering and selling of the Certificates the public. Defendants knowingly and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 52
Case No.

recklessly misrepresented the risks and true nature of the collateral (*i.e.,* home values) supporting the Certificates, which was included in the Registration Statement and Prospectus Supplements for each series of the Certificates and material to Plaintiff's and other investors' purchases of the Certificates.

169.    Defendants knew and intended that Plaintiff and members of the Class would, and in fact did, rely on the material misrepresentations and omissions in the Registration Statement and Prospectuses. In fact, Defendants knew or recklessly disregarded that inflated appraised home values to would induce Plaintiff and the Class to invest in the Certificates and thereby generating substantial fees and commissions for themselves in doing so.

170.    Plaintiff and Class members reasonably relied, to their detriment, on Defendants' misrepresentations in deciding to purchase certain WaMu Mortgage Pass-Through Trust Certificates. Plaintiff read the Prospectuses and relied on the reported strong underwriting standards used to assure Plaintiff and other Class membes that mortgages were issued only after the real-estate that collateralized the loans had been subjected to objective and independent real estate appraisals that met the standards of USPAP. Plaintiff and other Class members relied on these statements as being materially complete and not omitting material information.

171.    At the time Plaintiff and other Class members purchased the Certificates, they did not know of the false and/or misleading statements and omissions. Had Plaintiff and other Class members known of the true facts, they would not have purchased the Certificates or would have done so at substantially lower prices.

172.    As a direct and proximate cause of Defendants' fraud and deceit, Plaintiff and other Class members suffered damages in connection with their purchase of the Certificates.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## COUNT VI

### CIVIL CONSPIRACY
### (Against All Defendants)

173.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-92 and ¶¶138-172, above, except as otherwise indicated.

174.    WaMu, First American and eAppraiseIT, and potential unnamed defendants, entered into an agreement and conspired to, among other things, unlawfully deprive Plaintiff and members of the Class of their money by making untrue statements of material fact and by omitting to state certain material facts necessary to make the statements that were made not misleading.

175.    Defendants had knowledge of and agreed to the misconduct alleged herein. Defendants and their affiliates conspired with each other for the common and shared purposes of producing appraisal reports that inflated the value of properties in order to sell otherwise unqualified mortgage loans to investors.

176.    WaMu, as originator of the MBS sold to Plaintiff and other Class members, conspired with First American and eAppraiseIT to systematically inflate the appraised values of the properties that secured the mortgages underlying the Trusts.  First American and eAppraiseIT unlawfully agreed to violate federal regulations and appraiser independence requirements by allowing Defendants' loan origination staff to hand select appraisers who had agreed to provide artificially-inflated home values to support the MBS packaged and sold by Defendants to Plaintiff and other Class members.

177.    Defendants were aware of First American and eAppraiseIT's conduct of inflating appraisal values on their mortgage loans with undisclosed risks to third parties, and knowingly, willfully and deliberately participated directly and indirectly by deceiving Plaintiff and other Class members.

178.    Consequently, Defendants are jointly and severally liable to Plaintiff and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 54
Case No.

members of the Class.

## COUNT VII

### NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

179.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-92 and ¶¶138-178, above, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For purposes of this claim, Plaintiff asserts only negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

180.    This Count is asserted against all Defendants for negligent misrepresentation under common law principles.  Throughout the Class Period, Defendants made materially false and misleading statements, as alleged above, concerning the appraised values of the properties that secured the mortgages underlying the Trusts.

181.    Defendants knew, or should have known, that the statements made during the Class Period were materially false and misleading.

182.    Defendants knew, or should have known, that the statements at issue here were intended to be transmitted to the investing public.

183.    Defendants owed Plaintiff and the Class a duty of reasonable care in connection with providing accurate information concerning its appraisal standards and appraised home values. Defendants breached this duty by making untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

184.    Plaintiff and the Class, as investors, were entitled to rely upon, and were justified in relying upon, the representations made by Defendants regarding their appraisal practices, appraisal values for properties underlying the mortgage loans that comprise the Trusts, and the LTV ratios reported in the Registration Statement and Prospectus Supplements. Plaintiff justifiably relied to its detriment upon Defendants' representations when deciding to purchase the

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 55
Case No.

1    Certificates.

2        185.    Plaintiff had no knowledge of the false and misleading nature of the Defendants'

3    representations when purchasing the Certificates, and believed them to be true. Had Plaintiff

4    been aware of the true facts, it would have either not purchased the Certificates, or would not

5    have purchased them at the inflated prices paid.

6                                    **COUNT VIII**

7        **VIOLATIONS OF THE WASHINGTON STATE CONSUMER**
         **PROTECTION ACT, RCW 19.86.010, ET SEQ.**
8                          **(Against All Defendants)**

9        186.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶33-92 and

10   ¶¶138-185, above, except as otherwise indicated.

11       187.    As a direct and proximate cause of Defendants' acts and conduct and

12   dissemination of materially false and misleading statements and failure to disclose material facts,

13   the value of the Certificates was artificially inflated and Plaintiff sustained damages in

14   connection with its purchase of Certificates when the value declined.

15       188.    The Washington Consumer Protection Act applies to protect all consumers in

16   Washington and other states because the false and/or deceptive acts or practices at issue in this

17   case were carried out in the State of Washington.

18       189.    Defendants violated the Washington Consumer Protection Act by engaging in the

19   following false and deceptive trade practices:

20           a.      Falsely advertising the quality of the mortgage pool loans underlying the

21   Trusts;

22           b.      Deceptively advertising and inducing Plaintiff to acquire Certificates

23   which were not properly valued;

24           c.      Failing to properly notify or advise Plaintiff that the appraisals of the

25   properties in the mortgage pool loans underlying the Trust had been systematically inflated;

26           d.      Failing to reimburse Plaintiff for the inflated value of the Certificates; and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 56
Case No.

e.    Retaining money unlawfully collected from Plaintiff and thereby defrauding Plaintiff.

190.    It was Defendants' intent that Plaintiff would and did in fact rely on Defendants' advertising and inducements.

191.    It was Defendants' intent that Plaintiff would be and were in fact deceived by Defendants' characterization of the quality of the mortgage pools underlying the Trusts.

192.    Plaintiff in fact relied upon Defendants' advertisements and inducements and purchased Certificates.

193.    As a direct and proximate result of Defendants' false and deceptive advertising and inducements, Plaintiff was damaged.

194.    The false and deceptive advertising and inducements occurred in the course of business and commerce since Defendants are in the business of providing appraisals in connection with mortgages and in support of the Trusts and Certificates sold to Plaintiff and members of the Class. Defendants' conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions.

195.    The above-described false and deceptive trade practices affect the public interest and have the potential for continuation and repetition, adversely affecting the public interest unless redressed.

**WHEREFORE**, with respect to both the Claims for Violation of Federal Securities Laws and Washington State Laws, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Rescinding the sale of the WaMu Certificates and compelling all Defendants to

COMPLAINT FOR VIOLATIONS OF THE SECURITIES
ACT OF 1933 AND WASHINGTON STATE LAW - 57
Case No.

1  return to Plaintiff and the Class the consideration paid therefor;

2       D.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

3  this action, including counsel fees and expert fees; and,

4       E.     Such other and further relief as the Court may deem just and proper.

5  **JURY TRIAL DEMANDED**

6      Plaintiff hereby demands a trial by jury.

7  **DATED**:  October 30, 2009

8                   **TOUSLEY BRAIN STEPHENS PLLC**

9

10                   By: /s Kim D. Stephens P.S.
                     Kim D. Stephens P.S., WSBA#11984

11                       Nancy A. Pacharzina, WSBA# 25946
                 1700 Seventh Avenue, Suite 2200

12                   Seattle, Washington 98101
                 Telephone: (206) 682-5600

13                   Facsimile: (206) 682-2992
                 *kstephens@tousley.com*

14                   *npacharzina@tousley.com*

15                   *Liaison Counsel*

16

17                   **COHEN MILSTEIN SELLERS & TOLL PLLC**
                     Joel P. Laitman

18                       Christopher Lometti
                     Daniel B. Rehns

19                   150 East 52nd Street, Thirtieth Floor
                 New York, New York 10022

20                   Telephone: (212) 838-7797
                 Facsimile: (212) 838-7745

21                   *jlaitman@cohenmilstein.com*
                 *clometti@cohenmilstein.com*

22                   *drehns@cohenmilstein.com*

23                     Steven J. Toll
                 1100 New York Avenue NW, Suite 500 West

24                   Washington, D.C. 20005
                 Telephone: (202) 408-4600

25                   Facsimile: (202) 408-4699 (Facsimile)
                 *stoll@cohenmilstein.com*

26                   *Counsel for Plaintiff and the Proposed Class*